[Civ. No. 1808.   Third Appellate District.—May 3, 1918.]

# VENTURA MANUFACTURING AND IMPLEMENT COMPANY, Appellant, v. G. A. WARFIELD, Respondent.

SALE—ACTION FOR PRICE OF ENGINE—BREACH OF WARRANTY—SUFFICIENCY OF EVIDENCE.—In this action on a note for the balance of the price of a tractor engine, it is held that the evidence supports the findings that the engine never at any time measured up to the warranted test, that the defendant never at any time unconditionally accepted it, and that the whole transaction was subject of controversy founded on repeated complaints.

ID.—BREACH OF WARRANTY—QUESTION FOR JURY.—In an action on a note for the balance of the price of a tractor engine, the question of breach of warranty, where the findings are conflicting, is for the jury.

ID.—NOTICE OF DEFECTS—WAIVER.—The requirement in a contract for the sale of a tractor engine that notice of the failure of the engine to work properly must be given within a specified time is waived by the continued and persistent efforts of the agents of the seller, including the one who made the sale, to make the machine work, after the expiration of the time limited.

ID.—AUTHORITY OF SALE'S AGENT.—Authority of an agent who makes a sale of a tractor engine extends to all such acts as are properly connected with the sale and delivery of the machine, and does not stop when the proposed vendee first takes the machine on trial, but continues until the sale is completed or the machine returned.

ID.—KNOWLEDGE OF DEFECTS—WAIVER OF NOTICE.—The provision in a contract of sale of a tractor engine that the purchaser shall give written notice to the seller of any defects, and that failure so to do shall constitute a waiver of breach of warranty, is waived where the agent who made the sale is present at the trial of the machine, and thus has knowledge of failure of performance.

ID.—ACTION FOR PRICE OF ENGINE—OMISSION TO PLEAD—WAIVER—TRIAL.—In an action on a note for the balance of the price of a tractor engine, although the defendant did not specially plead waiver of condition in the warranty as to the time for trying out the machine, the case was not tried erroneously on the theory of such waiver where the answer and cross-complaint set out all the facts of the transaction.

APPEAL from a judgment of the Superior Court of Glenn County.   Wm. M. Finch, Judge.

The facts are stated in the opinion of the court.

George R. Freeman, W. H. Barnes, and Orr & Orr, for Appellant.

Duard F. Geis, and B. A. Herrington, for Respondent.

HART, J.—Plaintiff commenced the action to recover the sum of $1,967.50, and interest thereon, due on a promissory note, dated September 24, 1912, in favor of plaintiff and signed by defendant. In this note it was set forth that it was given in consideration of the sale by plaintiff to defendant of a "30 H. P. Pioneer Engine."

The case was tried before a jury and judgment was entered in accordance with their verdict, as follows: That defendant was entitled to recover from the plaintiff the sum of one thousand five hundred dollars, paid by him on account of the purchase of the engine, together with interest thereon; that defendant was entitled to have said promissory note surrendered and canceled as though fully paid; and that plaintiff is entitled to the possession of said tractor. From said judgment plaintiff appeals.

The defendant interposed an answer to the complaint and also filed a cross-complaint and set up a counterclaim. The defendant by answer denies the vital averments of the complaint and sets up an affirmative defense, based upon alleged false representations by the plaintiff with respect to the character of the engine for capacity and durability, and relies upon the alleged violation by plaintiff of the terms of the written warranty attached to and a part of the contract of sale. The cross-complaint repeats the allegations of the answer respecting the alleged false representations by the plaintiff and charges that solely by the representations so made the defendant was induced to enter into the contract for the purchase of the tractor; charges that the engine which was delivered to the defendant by the plaintiff was not the engine which he agreed to buy and which the plaintiff agreed to deliver to him; alleges that the plaintiff violated the terms of its warranty and that, upon learning of the difference in the engine delivered and the engine which he purchased and the plaintiff promised to provide him with, and of the defects of the engine delivered, the defendant immediately notified plaintiff thereof and rescinded the contract, and demanded of the plaintiff a return of the cash money paid on account of the sale and the cancella-

tion of the note given by him to the plaintiff for the balance of the purchase price.

The foregoing, while only a brief statement of the allegations of the pleadings filed by the defendant, is sufficient for present purposes and to show the general issues upon which the cause was tried and upon which it is submitted here by this appeal.

The facts are briefly these: Some time in the month of May, 1912, one C. W. Horstman, a salesman for plaintiff, solicited defendant to purchase a tractor and exhibited to him certain pamphlets and catalogues describing gas engines and also photographs thereof. The negotiations led to an agreement by the defendant, on the twenty-second day of June, 1912, to purchase a certain engine, a description and a photograph of which were contained in the pamphlets and catalogues referred to. Thereupon, and on the day named, the following order or agreement was signed by the defendant and delivered to plaintiff through its salesman, Horstman:

"Order for Gas and Gasoline Engine:

"To Ventura Mfg. and Imp. Co. Town Ventura, State Calif.

"The undersigned of Princeton Post Office, County of Colusa, State of Calif. Rural Route No. —— hereby purchases of you, subject to all conditions of agreement and warranty printed on back of this order and made a part hereof, to be shipped to G. A. Warfield Ranch, Marysville, Calif.— 'One 30 H. P. Pioneer'—Pioneer Tractor gas or gasoline engine (reg. size of pulley), complete including necessary fixtures, and to settle for said engine by payment of (3467.50) thirty-four hundred sixty-seven 50-100 Dollars as follows: Fifteen hundred Cash on delivery of engine, Nineteen hundred sixty-seven 50-100 note due Nov. 15, 1912. It is expressly agreed that this order shall not be countermanded, and that said engine shall remain and be held by the undersigned as your exclusive property until purchase money shall have been paid in full. It is expressly agreed that the engine shall be and remain personal property in what so ever manner it may be annexed to realty.

"Dated the 22nd day of June, 1912.

"Sold by C. W. Horstman.

"Signed: G. A. WARFIELD."

At one end of said order is written: "Note to bear interest at seven per cent after maturity. Tractor to have 60 gal. radiator and extension and swinging hitch."

The warranty is in the following language:

"Pioneer Tractor Co. (Incorporated) warrants the within described engine to do good work, to be well made, of good materials, and durable if used with the proper care. If upon trial, with proper care, the engine fails to work well, the purchaser shall immediately give written notice to Pioneer Tractor Co., Winona, and to the agent from whom it was purchased, stating wherein the engine fails, shall allow a reasonable time for a competent man to be sent to put it in order, and render friendly assistance to operate it. If the engine cannot then be made to work well, the purchaser shall immediately return it to said agent, and the price paid shall be refunded which shall constitute a settlement in full of the transaction.

"Use of the engine after three days, or failure to give written notice to said Company and its agent, or failure to return the engine as above specified, shall operate as an acceptance of it and a fulfillment of this warranty. No agent has power to change the contract of warranty in any respect and the within order can be canceled only in writing from said Company's Winona Office.

"This express warranty excludes all implied warranties and said Company shall in no event be liable for breach of warranty in an amount exceeding the purchase price of the engine. If within ninety days' time any part proves defective, a new part will be furnished on receipt of part showing defect."

On the second day of September, 1912, a tractor was delivered to the defendant at his ranch by Horstman. This, as the defendant testified, was after the harvesting season had ended, and when there was practically no opportunity for testing out the tractor as fully as was desirable and necessary.

There is, in point of fact, no dispute as to the proposition that there were material differences in mechanical construction between the engine purchased by the defendant and which the plaintiff agreed to furnish him with and the engine actually delivered. But, for the purpose not only of showing the differences referred to but that from the time, approximately, that the engine was received by the defendant, he was dis-

satisfied therewith and protested, as he continued thereafter to protest, against accepting the tractor upon the ground that it was not the machine he had bargained for, we will here present a brief statement of his testimony with regard to the transaction, as follows: He stated that the engine delivered was not the character of engine ordered by him as represented by the diagram and catalogue exhibited to him by Horstman; that the radiator held twenty-four and one-half gallons of water instead of sixty; that the engine delivered had no muffler over the exhaust-pipes, there being nothing "to protect ripe grain from being burned from the cinders from the exhaust. The sparks shot from the exhaust free and clear. The main oiling system in the main pump was supposed to be in the cab, in front of the operator of the engine, in plain sight at all times, and upon examination I found this oiler was down under the hood, alongside of the cylinders and in grease where it was impossible to see it without stopping the engine, raising up the hood, and wiping off the grease, and using some artificial light to see if the oil was running. In the engine ordered this particular oil was to be in the cab in sight of the operator at all times, so that he could know that the main bearings were getting oil at all times. . . . The gears were supposed to be entirely inclosed in a case to exclude all dust from getting in the oil and among the gears, and upon examination I found there was an opening alongside of the gears on both sides, under the hood, where the dust from the fan, driving past the cylinders, would finally end up in this case where these gears revolved, and did not give any protection to speak of from any dust flying at all; the fan drove the dust back to the gears. . . . This was represented not to be the case in the engine ordered—that they were to be inclosed, all incased, and to be protected entirely from the dust. . . . the engine was to have a Kingston carbureter and on examination we found there was a Bennett carbureter. . . . The fan for cooling air was to be a gear-driven fan, was not to have any belts at all, but to connect direct with the engine and drive with gears. It was described in the catalogue as a direct, gear-driven fan, and when the engine arrived it was found to have a bolt drive with spring tightener. . . . There was an apparent defect in the wheels. The spokes were loose in the rim."

Accompanying Horstman, when the engine was delivered to defendant, was a Mr. Muir, an expert sent by the Pioneer

Tractor Company, to demonstrate it.  On the next day, Muir, driving the tractor, took it out into a field with some plows and operated it for two hours or more and it was then placed in a shed on defendant's premises.  At the time of the delivery to defendant he called the attention of Horstman to the differences between the engine he received and the one he expected to receive.  As to the radiator, Horstman stated that he was confident it would keep the engine cool but that "if it didn't they would put on a larger radiator. . . . He said the only way to find out was to try it out in harvest."  The witness stated: "I told him I didn't want it the way it was.  It was not the engine I had picked out on the catalogue and I didn't think it would work at all and I wouldn't take it under those conditions. . . . They put it in the shed on the ranch and left it there."

There is evidence that Horstman and the plaintiff attempted to reason with defendant and show him that by proper handling the tractor would do the work and so come up to the warranted test as to capacity and durability, and that thus the defendant was persuaded to give it a further trial.  Accordingly, on the twenty-fourth day of September, 1912, defendant made a cash payment of one thousand five hundred dollars and executed and delivered to Horstman the note sued upon, it being made payable on August 1, 1913, which would be after the harvest season of 1913.  After the trial made by Muir in the early part of September, no attempt was made to use the tractor until November, when defendant took it out for the purpose of plowing.  He testified: "After I got the engine started I had difficulty in keeping it running.  The ignition did not seem to work well, and the fan gave me considerable trouble. . . . The shift gears would not work well.  I worked with it several days, plowing, or trying to plow, and finally parts of it began to go to pieces.  The fans broke.  I had to go down and get a fan-belt in town, and the magneto went out of commission entirely from no cause that I could see, and I took the magneto down to San Francisco and got another one; then I got an engineer to help me on the engine and the two of us worked with it and fought it, and we got the engine finally to go a little piece. . . . Then the engine broke down. . . . It took me a week to plow a piece that should have been plowed in two days.  The fan-belt proposition went to pieces, the fan-belt and the bearings that run this shaft. . . . We

took those to Colusa and had them re-babbitted. . . . Then the wheels began to develop defective; the spokes were loose and that caused a crystallization in the rim and each spoke in the rim split out clear from the spoke to the outside of the rim, and when we brought the engine in it had something like twenty-four or twenty-five cracks across the rim. . . . We took it back to the shed and on the way home the fan-belt and gears went all to pieces.'' Some rims were shipped to him by plaintiff and were put on the tractor by a man representing plaintiff, who also re-babbitted the bearings on the fan shaft.

In November, 1913, defendant attempted to harrow with the tractor, but there was a recurrence of the troubles he had theretofore had—the spokes getting loose, making it necessary to get new ones, the connecting rods not staying tight, the fan-belt breaking, the shift gears giving trouble, the engine heating and the magneto giving trouble so that he ran on the battery. He finished his harrowing with mules and put the tractor back in the shed. On the 14th of May, 1914, he started to do some grading and on the way to the field with the tractor the clutch broke; he sent to plaintiff for a new disk, which came on May 25th. He still had trouble with the engine, and, after doing about one-third of the grading, he discontinued the work. In June he hired an engineer and they worked ten or fifteen days on the engine and he then hired another engineer to inspect it. They commenced harvesting and, on the third day, ''everything went to pieces, and we opened it up and the crank shaft and connecting rods and everything were in a pile.'' He telegraphed plaintiff for another crank shaft, which came to him after a long delay and after he had tried to have the old one welded in Sacramento. He hired an expert mechanic to set the crank shaft and the engine was put back ''in practically as good condition as it could be put.'' The next day the engine commenced to heat and sometimes two-thirds of the day was lost waiting for the engine to get cool. The harvesting, which lasted from June 9th to July 23d, was not successful, the witness stating that he probably lost half of each day on account of the engine. Then defendant tried to use the engine for pumping water for irrigating an orchard, but could not keep it cool, and after two or three days he took it back to the shed. On the way there, while running on a county road, the front axle broke. He had this repaired and then placed the tractor in the same place in the

shed where it had been left by Horstman at the time of its delivery to defendant.

Expert testimony introduced by defendant tended to show that the construction of the engine was not proper in certain specified particulars, and the engineer sent by plaintiff to work on the tractor stated, on cross-examination, that "it was essential that the fan construction should be improved and changed to make it of any practical value," and that the mechanical construction of the engine should be changed.

Certain correspondence was introduced in evidence. The first letter in the record is dated Ventura, November 20, 1912, written by plaintiff to defendant, and refers to a letter theretofore received from defendant in regard to "spikes for wheels."

On December 26, 1912, defendant wrote plaintiff as follows: "The engine [Pioneer 30] which I purchased from you by contract has proved to be far from satisfactory, and along with that your company, through Mr. Charles Horstman, have misrepresented things to me. The engine is not built for the work intended or for any durability. It is now out of commission. I have asked you people to send your mechanic, but no answer; have asked you to send extras from your shops at Ventura, instead I am compelled to pay express on extras from Ind., not getting what I asked for, have to have the extras made here at the foundry or any other place at a great expense. Therefore, according to our agreement the engine is yours. I hereby cancel the payment of the note given you in payment of the engine. I ask you to send your representative here and inspect the engine, and you will find what I tell you is the truth. The engine is at your disposal. I am stuck with a contract which your engine should do but is unable to finish."

Plaintiff replied to the above letter, stating: "We feel confident your trouble lies in the fact that you do not know how to take care of the engine properly. If you had the right kind of an engineer on the machine, there would be nothing wrong with it." It was further stated that Mr. Horstman would call upon defendant.

On January 8, 1913, Horstman wrote to defendant: "Have sent off several wires yesterday to get some definite line-up from the Pioneer people with regard to their decision in the broken engine wheels."

The following letter, dated January 10, 1913, was sent to defendant by plaintiff: "We are in receipt of a letter from our Mr. Horstman stating that the wheels on the engine we sold you have cracked in several places. We at once took this matter up with the factory, advising them of the condition of the wheels, etc., and informed them that they would have to make these wheels good. The reply we received from them was that the breaking of the wheels was due to the carelessness of the engineer in not keeping the turn buckles or spokes tight, they also stated that they would furnish some extra heavy rims for this engine free of charge. . . . Mr. Horstman also reports that the other troubles you had on the engine did not amount to anything, as on all gasoline engines you may expect more or less minor troubles. . . . "

The defendant, on March 8, 1913, wrote to plaintiff a long letter, calling attention to alleged representations by Horstman regarding the engine, recapitulating particulars in which it had proven defective, and demanding the return of the one thousand five hundred dollars paid by him and the cancellation of the note.

On March 27th, the plaintiff replied to the above letter, stating, among other things: "When you signed the note, this was an acceptance of the engine. As for the note, it is out of our possession. You will take particular notice of the warranty on the back of the contract, which stated that 'no agent has the power to change the contract of warranty in any respect.' . . . We are well satisfied it is no fault of the engine that it was in the condition it was in."

Other correspondence followed, showing that defendant had gone to Ventura to endeavor to effect some sort of settlement, and, on September 9, 1913, defendant wrote to plaintiff again demanding the return of the money paid by him and the note, "or deliver to me an engine of equal value that will do the work fully guaranteed to my satisfaction."

The defendant explained, and the written correspondence above referred to corroborated him in that particular, that he made repeated trials of the tractor upon the solicitation and persuasion of Horstman, after in the first instance and the several times thereafter, he notified Horstman and the plaintiff that the machine was not the one which the latter agreed to deliver to him and that the one delivered had failed, after the several trials, to meet the warranted test.

Appellant relies upon the terms of the written warranty, denies that Horstman agreed that defendant might make a trial of the engine, but insists that if he did do so his agency was not proven and that the contract itself expressly provides that no agent shall modify its terms.

First, it is proper to observe that the transaction out of which this controversy arises was wholly between the plaintiff and the defendant, and that the assumption by the plaintiff, in its argument of the points submitted in support of this appeal, that the transaction was one between the Pioneer Tractor Company, the manufacturer of the tractor in question and defendant, cannot be maintained. By this statement we mean to say that the verdict, which is amply supported, is conclusive upon that question. The order or agreement is addressed to the plaintiff and the initial language thereof is: "The under-signed [defendant] . . . hereby purchases of you, subject to all conditions of agreement and warranty printed on back of this order and made a part hereof . . . 'one 30 H. P. Pioneer Tractor gas or gasoline engine.' " The agreement or order further provides that "said engine shall remain and be held by the undersigned [defendant] as your [plaintiff's] exclusive property until the purchase money shall have been paid." The evidence further shows that the transaction, so far as the seller was concerned, was from its beginning to and including the time at which this action was instituted, wholly and solely, and without any interposition whatever by the Pioneer Tractor Company, conducted by the plaintiff. Moreover, the promissory note executed by the defendant for the balance of the purchase price after a cash payment by the defendant of one thousand five hundred dollars had been made was made to and in favor of, and in the name of, the plaintiff. Furthermore, the note declared upon itself states that the consideration therefor is "that the said Ventura Manufacturing and Implement Company has agreed and promised that upon payment of said note, principal and interest, at maturity, . . . they will sell and transfer to the undersigned [defendant], at the price of said principal and interest, the thirty H. P. Pioneer Tractor which the said Ventura Manufacturing and Implement Company has this day intrusted to the care of the undersigned." Again, the note reads: "It is admitted and agreed that the said property so intrusted is the property of the said Ventura Manufacturing and Implement

Company, and shall remain in them until they shall make the aforesaid sale and transfer," etc.

But the contention is vigorously pressed that, assuming that the transaction was between the plaintiff and the defendant, there is no evidence showing that Horstman gave the defendant the right of any further trial of the engine for the purpose of testing its efficiency for the purposes for which it was intended and bought by the defendant than was expressly provided for in the warranty. It is further contended that, even if it had been made to appear that Horstman did allow the defendant such further trial of the engine, there is no evidence showing that he had authority to do so, and that, therefore, in doing so he exceeded his authority as agent and violated the provision of the warranty that "no agent has the power to change the contract of warranty in any respect, and the written order can be canceled only in writing from said Company's Winona office."

The theory upon which the defendant sought to present the case at the trial in the court below was that, the tractor delivered not being the one which the plaintiff agreed to deliver to the defendant, the negotiations between Horstman and the defendant as to the tractor delivered constituted a new contract, and that oral testimony disclosing the terms and conditions of such contract was necessary and proper. The trial court held that the defendant's pleadings failed to set up a new contract, but relied upon the original order and warranty, and, therefore, excluded testimony of a new contract. But we do not regard this as important in this case. The testimony, we think, very clearly shows: 1. That Horstman had the authority, as the plaintiff's sales agent, to give the defendant further opportunity to try out the engine; 2. That he did do so; 3. That the tractor delivered to the defendant failed to do the work for which such a machine is intended; 4. That it must be held that, under all the circumstances of the case, the defendant duly notified the plaintiff that the tractor was a failure and would not satisfactorily perform the work for which it was intended.

The third proposition above stated is, we think, abundantly supported by the evidence, to some of which we have specially referred above. We need not, therefore, reproduce herein upon that question further or other testimony of which there is an abundance.

That Horstman was a sales agent of the plaintiff and as such authorized to negotiate a sale of the tractor to the defendant is not disputed, but, in fact, admitted; and, under the state of this record, the verdict of the jury is conclusive upon the question of the extent of his authority in the negotiation of the transaction involved herein. In other words, the credibility of witnesses or the weight to be attached to the testimony being entirely a question for the jury, we may, therefore, accept the bare record as conclusive upon all questions of fact upon which there is therein testimony not inherently untruthful or improbable; and so viewing the record before us, we have found no reason for saying that the jury were not amply justified in finding, as from the verdict we must presume that they did find, that everything that Horstman did and said with respect to this transaction, from the time he procured from the defendant the order of June 22, 1912, for the tractor, until the defendant finally notified the plaintiff of his rescission of the contract and returned the machine to the place where the plaintiff delivered it, was done for the purpose of consummating an uncompleted sale of the tractor.

We may, however, refer to some of the testimony which tends strongly to show that Horstman had authority to make any arrangements with defendant that his judgment might dictate. Although the written order for the tractor was executed by the defendant and delivered by him to the plaintiff on June 22, 1912, the tractor was not delivered until the month of September of that year, which was after the end of the harvest season and at a time when a proper test of the engine could not well be made. The cash payment was made and the note for the balance of the purchase price given at the time of the delivery of the engine; and, although the written order of June 22d expressly provided that the note should be made payable on November 15, 1912, the said note, upon the consent of Horstman, was made payable August 1, 1913, which, as is obvious, was at a time of the year when the harvesting season was well near an end. The plaintiff accepted the cash payment and the note. The extension of the time of payment of the note beyond the harvesting season of 1913 and the acceptance by the plaintiff of the new arrangement so made by Horstman are circumstances which tend in some degree to show that Horstman had general authority as a sales agent of the plaintiff, and to show further that he not only did extend the

time for a trial of the tractor by the defendant, but that, as the plaintiff's agent, he had full authority to do so. But there is other testimony warranting the conclusion that Horstman, although only an agent for a special purpose, had general authority as such agent and was authorized to do all that was in his judgment required to consummate a sale of the machine to the defendant. We need not present herein an extended statement of said testimony. It is enough to say that, as seen, it was shown that, because the engine was not the one which the plaintiff agreed to deliver—that is, it was in many important particulars different in mechanical construction from the one agreed to be delivered—the defendant objected to accepting it; that Horstman, after some reasoning with the defendant, persuaded the latter to give it a trial to see if it would not do the work which it was represented the engine bargained for would do; that, prior to the month of December, 1912, the defendant did give it a trial, and that it failed to meet the test or the representations as to the engine the plaintiff agreed to deliver; that defendant, on the twenty-sixth day of December, 1912, addressed a letter to the plaintiff, stating that the engine had "proved to be far from satisfactory. . . . The engine is not built for the work intended or for any durability. It is now out of commission. I have asked you people to send your mechanic, but no answer," and in said letter asked for a cancellation of his note and a return of the money paid down when he received the tractor; that Horstman, after some further reasoning with the defendant, induced the latter to give it a further trial; that, from the very beginning of the repeated trials by defendant, parts of the engine broke or proved to be defective or incapable of the performance of their respective mechanical functions; that, from time to time, as the breakages occurred, or as the machine in certain particulars was upon repeated tests shown to be so defectively constructed as to render it inefficient for the purpose for which it was intended, the defendant notified the plaintiff thereof, insisted that the engine was a failure and refused to accept it; that the plaintiff and (on one occasion) the manufacturer supplied the broken parts of the engine with new parts; that the plaintiff sent an expert to the ranch of the defendant to assist in giving the engine a proper test; that Horstman on numerous occasions urged defendant to give the machine a

fair and further trial before refusing to accept the engine. In brief, the jury were well within the testimony adduced in finding, as their verdict implies that they did find, that the engine never at any time measured up to the warranted test; that the defendant never at any time unconditionally accepted it; that the whole transaction was at all times, after the engine was delivered to defendant, the subject of controversy between the latter on the one side and Horstman and the plaintiff on the other, founded upon repeated complaints by the defendant of the unsatisfactory work of the engine and his refusal to accept the machine.

It will not, of course, be disputed that the failure of the engine to come up to the standard for efficiency and durability represented and warranted by the plaintiff constituted a breach of the warranty. That it did wholly fail to come up to that standard, the evidence strongly tends to show. Nor will it be doubted that there is evidence warranting the implied finding that Horstman was a general sales agent of the plaintiff, vested with full authority to do whatever was reasonably requisite to effect a sale of the machine to the defendant; that, as such agent, he was authorized to waive any of the conditions of the original contract and waive written notice by the defendant of the defective and unsatisfactory operation of the tractor; and that he did, if, indeed, the plaintiff itself did not, waive the condition specified in the written order as to the time within which the defendant was to be restricted in trying out or testing the efficiency of the engine. In fact, as before suggested, the written order did not involve an unconditional agreement of sale, and the fact that the engine delivered was in material particulars different in mechanical construction from the one which the plaintiff agreed to deliver, and the further fact that it was delivered, through no fault of the defendant, at a season of the year when a satisfactory test of the tractor was impracticable, themselves necessarily operated to entitle the defendant to a reasonable time beyond that prescribed in the order, and under conditions more favorable for that purpose than existed at the time of delivery, to put the engine to a proper test.

A case in its facts substantially like this is that of *Springfield Engine & Thresher Co.* v. *Kennedy,* 7 Ind. App. 502, [34 N. E. 856]. It was there contended that the findings did not show that the agent of the plaintiff who sold a steam sepa-

rator to the defendant was the general agent of the plaintiff, and, therefore, was without authority to waive conditions in the contract of warranty. The court, replying to that contention, said: "Mitchner was the agent of the plaintiff to make sales of its machinery, and at the time he received the notice of the defects in the separator, and made the attempt to remedy the same, the findings show that he was the authorized agent of the plaintiff. *All that he did and caused to be done in relation to remedying the defects, and the promises made by him, were in the line of perfecting and completing the sale.* [Italics ours.] The contract made in the first instance was not an unconditional contract for the sale of the machine. The defendants had the right to return it if unsatisfactory. It is a familiar rule that notice to an agent is notice to the principal of any matter that is within the scope of the agency. In *Pittsburgh etc. Ry. Co.* v. *Ruby*, 38 Ind. 294, [10 Am. Rep. 111], it was held that 'notice to an agent of a corporation relating to any matter of which he has the management and control is notice to the corporation.' This rule is peculiarly applicable to foreign corporations doing business in this state. (*Phoenix Mut. Life Ins. Co.* v. *Hinesley*, 75 Ind. 1; *North British & M. Ins. Co.* v. *Crutchfield*, 108 Ind. 518, [9 N. E. 458].) The terms 'general agent' and 'special agent' are relative. An agent may have power to act for his principal in all matters. He is then strictly a general agent. He may have power to act for him in particular matters. He is then a special agent. But within the scope of such particular matters his powers may be general and with reference thereto he is a general agent. Mitchner was authorized to make sales of plaintiff's machinery in certain localities. His powers for that purpose were general, and with reference thereto he was a general agent. As such, he received notice of the defects in said machinery, and notice to him was notice to the principal. His subsequent acts and promises were in the line of perfecting the sale. We think he had the right to waive the written notice required by the contract and of the other stipulations therein contained which were for the benefit of appellant. . . . We find no reversible error in the record. Judgment affirmed, at costs of appellant." (See, also, *Peterson* v. *Walter A. Wood Mowing & Reaping Machine Co.*, 97 Iowa, 148, [59 Am. St. Rep. 399, 66 N. W. 96]; *D. M. Osborne & Co.* v. *Backer*, 81 Iowa, 375, [47 N. W. 70]; *Hull* v. *Prairie Queen Mfg. Co.*,

92 Kan. 538, [141 Pac. 592]; *Pitsinowsky* v. *Beardsley*, 37 Iowa, 9; *First Nat. Bank* v. *Dutcher*, 128 Iowa, 413, [1 L. R. A. (N. S.) 142, 104 N. W. 497]; *Harrison* v. *Russell*, 12 Idaho, 624 [87 Pac. 784]; *Sandwich Mfg. Co.* v. *Feary*, 22 Neb. 53, [33 N. W. 485]; *McCormick Harvesting Machine Co.* v. *Dodkins*, 24 Ky. Law Rep. 2306, [73 S. W. 1129]; *Luitweiler Pumping Engine Co.* v. *Ukiah Water & I. Co.*, 16 Cal. App. 198, [116 Pac. 707, 712].)

Summarizing the conclusions announced in the above cases, whose facts are quite similar to those of the case at bar, they are: 1. That the question of a breach of warranty such as the one involved in this case is, upon conflicting evidence, one for the jury; 2. That where, in such case, there is a requirement in the contract that notice of the failure of the machine to work properly must be given within a specified time after its receipt, such notice is waived by the continued and persistent efforts of the seller's agents, including the one who made the sale, to make the machine work after the expiration of the time limited; 3. That, under such facts as are present here, a sales agent's authority extends to all such acts as are properly connected with the sale and delivery of the machine, hence his authority does not stop when the proposed vendee first takes the machine on trial, but continues until the sale should either be completed or the machine returned without any sale being made; 4. That, although the contract of sale stipulates that the purchaser shall give written notice to the seller of any defects in the machinery purchased, and in effect provides that the failure to give such notice shall constitute a waiver of any breach of warranty, if the agent of the seller is present at the trial of the machine, and in this manner has knowledge that the machine is not performing according to warranty, the provision as to notice is waived.

As above stated, the facts of this case bring it well within the doctrines above enunciated. There is, therefore, no ground for the contention of the plaintiff that the acts of Horstman with reference to the transaction after the execution of the order by defendant had the effect of modifying or altering the terms of said order or of introducing a new term therein.

It is claimed that the ruling allowing in evidence the catalogues and photographs, published by the plaintiff, showing the character and mechanism of the tractor referred to in the written order and which were exhibited to the defendant by

Horstman when he first opened negotiations for a sale of the engine to defendant, was erroneous and prejudicial. The point is devoid of merit. The written order does not contain a detailed description of the machine bargained for in the first instance, and it was proper to show that the defendant was induced by the representations contained in the plaintiff's catalogue and photograph of the machine to enter into the agreement. (*Luitweiler etc. Engine Co.* v. *Ukiah Water etc. Co.,* 16 Cal. App. 198, 210, [116 Pac. 707, 712].)

There are other rulings as to evidence admitted against objection by the plaintiff which it is claimed involved error and seriously affected plaintiff's rights. We will not give these special notice herein. It is sufficient to say that we have carefully considered them and are convinced that they could not have had the effect of damaging the plaintiff's rights, even if it be true that some were without legal justification.

It is further complained that the court committed serious error in some of the instructions submitted for the jury's guidance in considering the evidence. The instructions referred to, it is insisted, erroneously stated and assumed: 1. That the plaintiff warranted the engine, whereas, so it is contended, the warranty is the warranty of the Pioneer Tractor Company, the maker of the engine; 2. That the written warranty could be waived by the plaintiff; 3. That the jury were authorized to consider any evidence tending to show that after difficulties arose in the operation of the engine the agent of plaintiff induced the defendant to make further trial thereof after the time limited by the warranty.

All the above propositions have already been considered and disposed of herein. It may be added, however, referring to the first of the stated objections under this head, that the warranty of the Pioneer Company is, in the very nature of the situation as disclosed by the record, the warranty of the plaintiff. The latter, as the general distributing agent in California of the former, has necessarily assumed as such agent all the burdens and conditions of the warranty, this being shown by the undisputed fact that the contract as to the particular tractor in question is between the plaintiff and the defendant and not between the Pioneer Company and the defendant.

As to the point that the defendant does not plead a waiver and hence the case was tried upon an erroneous theory, the

reply is that, while neither in the answer nor cross-complaint is there a waiver specifically pleaded, all the facts of the trans-action, from its inception to its finish, are set out in both those pleadings of the defendant, and from them the implication irresistibly follows that there was a waiver by the plaintiff · of the condition in the warranty as to the time for trying out the machine.

We have found no reason for disturbing the result arrived at in the court below; and the judgment is accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 2, 1918.